219 So.2d 278 (1969)
Joseph TROSCLAIR and George Blanchard
v.
The SUPERIOR OIL COMPANY.
No. 7565.
Court of Appeal of Louisiana, First Circuit.
January 27, 1969.
*279 Lofaso & Bourg, Houma, for appellants.
Peltier & Peltier, Thibodaux, for appellee.
Before LANDRY, REID and SARTAIN, JJ.
REID, Judge.
Plaintiffs Joseph Trosclair and George Blanchard brought this suit against Superior Oil Company for damages for the loss of oysters through oil contamination, which was claimed to have been caused by the overflow of oil from the defendant, Superior Oil Company's pit, in connection with said company's drilling operation. The suit was for Thirty-seven Thousand Five Hundred and No/100 ($37,500.00) Dollars with legal interest from judicial demand until paid and costs.
The plaintiffs allege that they were the lessees under an oyster lease from the State of Louisiana bearing Nos. 12018 and 14130 covering forty (40) superficial acres of water bottoms in Bayou Go To Hell in Terrebonne Parish. The Superior Oil Company, defendant, was the owner and/or operator of one certain oil and gas unit referred to as Four Island Dome LL&E State Unit No. 22 Lease Well No. 3 situated in the Parish of Terrebonne. There seems to be six (6) acres contained in Lease No. 14130 and this is the lease where most of the oysters are alleged to have been contaminated were situated. Lease No. 12018, contained thirty-four (34) acres but did not have a large quantity of oysters.
The defendants filed an answer denying their liability but that it was the owner and operator of the oil, gas and mineral rights in Sections 24 and 25 T 21 S, R 16 E and Sections 19 and 30 of T 21 S, R 17 E, under a lease from the State of Louisiana being State Lease No. 724, dated March 26th, 1946 and a lease from the Louisiana Land and Exploration Company dated July 31st, 1946, both leases being recorded in the Conveyance Records of Terrebonne Parish; and that by an instrument dated March 17th, 1947, by agreement between the State of Louisiana and The Louisiana Land and Exploration Company a pooling agreement was entered into establishing certain units, which units were designated as Units 11, 12, 19 and 20 and that all of their operations in the area where plaintiff oyster leases covered, were for the exploration and production of oil, gas and other minerals by virtue of the leases and pooling agreement above set out.
*280 The defendants further aver that all their rights and obligations, which the plaintiff might have had under its oyster leases were subject to and subservient or subordinate to the rights of the defendant to explore for and conduct mineral operations by virtue of the leases above mentioned.
The matter was tried in the Lower Court and the Trial Judge with written reasons rendered judgment for the defendants, rejecting plaintiff's demands and dismissing his suit at its costs. From this judgment the plaintiffs have appealed to this Court.
Plaintiffs alleged and offered testimony to prove that sometimes between December the 20th, 1960 through January of 1961, the defendant, while operating its well about one-half to three-quarters of a mile from these oyster leases, was negligent in allowing waste water to escape into the bayou by an overflow from a pit and caused the damages to their oyster bed. Their main item of damages was for Three Thousand Six Hundred and No/100 ($3600.00) Dollars for One Thousand Two Hundred (1200) sacks of marketable oysters, which were rendered unmarketable by the contamination with the oil in the bayou. All other items of damages have been waived by the plaintiffs, both in the Lower Court and by silence in their brief in this Court.
There doesn't seem to be much question but what the oysters had an oily taste in January of 1961. The plaintiff, Joseph Trosclair testified that, in answer to a question as to where the oil came from, "well from Superior's Well. That is all I could see. That is the only well that they had around there."
Actually there was another well in the locality, according to the testimony of one of plaintiff's witnesses, Mr. Jack Hood. Mr. Hood was an employee of the Louisiana Wildlife and Fisheries Commission and his duties were stream control and the regulations therefor on the production of oil, gas and sulphur and drilling and so forth. According to Mr. Hood's testimony, there was another drilling rig in this area about the same distance and which had violated the Louisiana Pollution Laws by discharging oil into the water. The plaintiffs assume that the oil in question, which caused the pollution came from the pit or well of the defendant company but actually this is not supported by the evidence. There is no question but that the defendant's well was located from one-half to three-quarters of a mile away from the oyster bed. The Court, in the testimony, commented on the fact that the well was situated this distance and he didn't think that it was too material to what was found on the bedding grounds. No samples of the water over the bedding grounds was offered in evidence. Plaintiff also offered the testimony of Dr. Emery Hadu and Dr. Lisle St. Amant as expert witnesses. Both of these men were Marine Biologists. They testified in substance about the effect of oil on the oysters or the water on the oysters creating the oily taste, which rendered the oysters unmarketable. However, Dr. St. Amant testified that there was not enough scientific evidence to show that oil per se can kill oysters. He further testified that the oyster filters a considerable amount of water daily and as long as the water is contaminated he is subject to pick the material up but that if an oyster is moved to a clean area, he will probably rid himself of the oil taste in a week or two or three weeks.
The defendants put on the stand Mr. August Pitre, who is one of the largest oyster producers in the state and president of the Louisiana Oysters Association. He has been an oyster fisherman for some forty-five (45) years. He testified that he examined the oyster beds of Mr. Trosclair and Mr. Blanchard on March the 5th, 1961. He took some ten or twelve samples all over the beds and that the oysters on that date did not have an oily taste at all. He further testified that these oysters could have been sold on the market at that time and that the market extends to April *281 or May of each year and that in Lent you always got a good market for good oysters.
The learned Trial Judge in his written reasons for judgment found as follows:
"The testimony as presented in the record can only lead to the conclusion that plaintiffs have not carried the burden of proving undue care and negligence on the part of defendant in the exercise of its superior rights under its mineral lease. While it is true that there is testimony in the record that during the time complained of, some oil spillage was found near the drilling site located approximately one-half (½) to three-fourths (¾) of a mile from the oyster lease, there was no positive proof offered by plaintiffs that it was actually this oil that contaminated their oysters. In fact there is testimony in the record that during the time complained of there was another well being worked in the immediate vicinity of these oyster beds.
In addition to the above, the Court is of the opinion that plaintiffs have not proven any actual loss or damage for which they could be compensated. The record shows that the oyster leases in question were natural reefs and that the oysters thereon were considered wild oysters rather than planted oysters. The testimony of plaintiffs shows that they only harvested oysters from these leases periodically and with no set schedule. The record leaves no doubt but that during the month of January, 1961, these oysters had an oily taste. In fact this was testified to by all witnesses for both plaintiffs and defendant. However, according to the testimony of the experts produced by plaintiffs, and particular the testimony of Dr. St. Amant, oil which might intrude into an oyster bed will not kill the oysters, and although it will give them an oily taste this condition is usually cleared up within a month or two thereafter. This opinion coincides with the testimony of Mr. August Pitre who testified that when he first visited the oyster beds in January, 1961, the oysters had an oily taste but that when he revisited the oyster beds in March of 1961 he found that these oysters were free of an oily taste. He further testified that the oysters could have been harvested from these beds in March of 1961 and that during the month of March and April the market for oysters is usually good. Plaintiffs have offered no reasons why the oyster beds were not rechecked later and at a time when they could have been marketed. The record further shows that in February of 1962 the oysters were actually harvested from this lease, free from any oily taste, and marketed by Wilson Voisin under an agreement with plaintiffs."
With this finding by the Trial Court, we are in accord.
Assuming for the sake of argument that the oysters were contaminated by the overflow of oil into the bayou, there is no question but what the mineral lease of the defendants was a prior lease and our Courts have consistently held that an oyster bed lease is subject and subordinated to a mineral lease, which was dated and recorded prior to the oyster lease. The case of Vodopija v. Gulf Refining Company, 198 F.2d 344 (5 Cir. La.1952), held as follows:
"The defendant had the legal right and in fact was obligated under its mineral lease reasonably and properly to develop the bay area covered by the lease for oil production and the rights of plaintiff under its oyster lease was subject and subordinate to that right."

This decision has been consistently followed in other cases. In the case of Collette v. Marine Exploration Company, 213 F.Supp. 609 (E.D.La. 1963) was another case where plaintiff sought recovery for damages to his oysters and the Court said:
"The law of Louisiana with respect to the rights of the owner of an oil, gas *282 or mineral lease, and the rights of the owner of an oyster lease where both cover the same area is well settled. The owner of an oil, gas and mineral lease, such as Phillips Petroleum Company in this case, has a legal right, and in fact, is obligated to reasonably and properly develop the area covered by the mineral lease for oil production. On the other hand, the owner of a State oyster lease, such as the plaintiffs in this case, which covers the same area as that covered by the oil, gas and mineral lease, may exercise all of the rights acquired under his lease, but these rights are subject to the right of the owner of the oil, gas and mineral lease to explore for oil in the same area. Every person must so exercise his right as not to unduly or negligently injure others. The burden of proof is upon the plaintiff to show that the defendant, in the exercise of its rights under the mineral lease, failed to use due care and thus negligently caused injury or damage to the plaintiff. Vodopija v. Gulf Refining Company, 5 Cir., 198 F.2d 344. Under the laws of Louisiana, the co-existing rights of the holder of an oyster bedding lease and the holder of a mineral lease covering the same property must be so exercised by each party as not to unduly injure or damage the other. Both parties have a right and an obligation to conduct their respective operations and to so conduct them in a manner that will not negligently cause damage to the other. Proof in this case is therefore required from which reasonable minds could infer that the defendant did something which a reasonably prudent person under the same circumstances would not have done or had done it in a way in which a prudent person would not have done it, and had thus caused damage to the plaintiff. Collins v. Texas Company, 5 Cir., 267 F.2d 257. (Emphasis added)"
See also Begovich, Gonzales and Plaisance v. Texas Company, 209 F.Supp. 412 (E.D.La.1962) and Skanski v. Humble Oil and Refining Company, 176 So.2d 236 (La. App., 4th Cir. 1965).
For these reasons we find the judgment of the Lower Court is correct and it is hereby affirmed at appellants' costs.
Affirmed.